UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: | Bankruptcy Case No. 17 B 11668 |
| CHRISTOPHER V. PRATOLA, | Chapter 13 |
| Debtor. | Honorable Janet S. Baer |

## MEMORANDUM OPINION

This matter is before the Court for ruling on the chapter 13 trustee's motion to dismiss the case of Christopher V. Pratola pursuant to 11 U.S.C. § 1307(c).[1] The trustee asserts that there is cause for dismissal because Pratola owes unsecured debt in excess of the $394,725 limit set forth in § 109(e). For the reasons set forth below, the motion to dismiss will be denied.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## BACKGROUND

From August 2003 to December 2007, Pratola earned an undergraduate degree in interdisciplinary studies at Arizona State University. (Docket No. 23, at 2, ¶ 4.[2]) Subsequently, from January 2008 to June 2012, he earned a graduate degree in cinema and television production at the University of Southern California. (Id.) In order to pay for his education, Pratola incurred

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

[2] Unless otherwise noted, all docket and claims register references are to Bankr. No. 17 B 11668.

$374,108 in student loan debt from Federal Student Aid (an office of the U.S. Department of Education); that debt is now serviced by Federal Loan Servicing. (*Id.*) In addition, he incurred $194,563 in other student loan debt that is owed to "Aes/Chase Bank" and "Aes/Nct." (Docket No. 8, at 2-3.)

Since March 2014, Pratola has been paying back the educational debt owed to the U.S. Department of Education through an income-based repayment plan ("IBR plan"). (Docket No. 23, at 3, ¶ 8.) Under the IBR plan, he is making monthly payments that are equal to 10% of his discretionary income for a term of twenty-five years. (*Id.* at ¶ 6.) Upon completion of the payments, any remaining balance will be forgiven. (*Id.*) However, if Pratola defaults, then the entire remaining balance will become due. (*Id.* at ¶ 7.) As of May 2017, Pratola's monthly IBR plan payment was $268. (*Id.* at 8, ¶¶ 19 & 20.) If his discretionary income increases, then the payment will increase, but it cannot exceed what the payment would be under a standard ten-year plan. (*Id.* at ¶ 19.) Under such a plan, Pratola's monthly payment would be $3,655.75. (*Id.*)

Since 2013, Pratola has been employed as a "Genius" by Apple, Inc.[3] (Docket No. 1, at 31.) In 2015, he earned $41,883; in 2016, he earned $39,504; and in 2017, he is on pace to earn $44,207. (*Id.* at 37-38.) His average monthly take-home pay is $2,733, and his average monthly expenses are $2,259, leaving $474 of average monthly disposable income. (*Id.* at 32-34, ¶¶ 12 & 22c.) Pratola's monthly expenses include, among other things, $825 for rent, $300 for food and housekeeping supplies, $300 for transportation, and $268 for student loan payments. (*Id.* at 33-

---

[3] "Genius" is the title of the position that Apple, Inc. assigns to its retail store customer service and support employees.

2

34, ¶¶ 4-21.) He owns a twelve-year-old car with over 159,000 miles, a few shares of Apple stock, scripts that he has written, and various other items of personal property. (*Id.* at 11-15, ¶¶ 3-54.)

By most standards, Pratola's income and expenses are modest, and he owns little property. He has a relatively tight budget and seems to have been living from paycheck to paycheck for the last five years. Assuming that Pratola does not experience a dramatic and unforeseen increase in income, he must continue living modestly for the indefinite future.

On April 13, 2017, a little less than five years after completing graduate school, Pratola filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code. (*Id.* at 1-6.) In his schedules, he lists $591,223 of unsecured debt. (Docket No. 8, at 1-8.) That amount consists of student loan debt in the amount of $568,671 and credit card debt in the amount of $22,552. (*Id.*) Proofs of claim filed in the case total $469,844.42, including a claim for $447,103.99 filed by the U.S. Department of Education. (Claims Register, Summary & Claim No. 9-1.)

On April 20, 2017, the trustee filed a motion to dismiss Pratola's case because he owes unsecured debts in excess of the $394,725 debt limit. (Docket No. 17, at 1.) On August 11, 2017, after the trustee's motion to dismiss had been fully briefed by the parties, the Court took the matter under advisement. After a review of the applicable law, legislative history, relevant pleadings, and arguments of the parties, the Court is now ready to rule.

## LEGAL STANDARDS

In the motion to dismiss in this matter, the trustee asks that the case be dismissed pursuant to §§ 109(e) and 1307(c). (*Id.*) In order to determine how to rule on the motion, the Court turns to the relevant provisions of the Bankruptcy Code. Section 109(e) provides, in relevant part, as follows: "Only an individual with regular income that owes, on the date of the filing of the petition,

3

noncontingent, liquidated, unsecured debts of less than $394,725 and noncontingent, liquidated, secured debts of less than $1,184,200 . . . may be a debtor under chapter 13 of this title." 11 U.S.C. § 109(e). In turn, § 1307(c) provides, in pertinent part, that "on request of a party in interest . . . after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1307(c). Section 109(e) does not provide authority for the Court to dismiss a case; rather, the provision only defines who may be a debtor under chapter 13. 11 U.S.C. § 109(e). Section 1307(c) provides express authority for the Court to dismiss a case for cause on request of a party in interest and after notice and a hearing. 11. U.S.C. § 1307(c).

## DISCUSSION

There are two issues before the Court: (1) whether educational debt subject to an IBR plan is noncontingent for purposes of the § 109(e) unsecured debt limit; and (2) whether § 1307(c) requires the Court to dismiss a case if the inclusion of educational debt causes a debtor to exceed the limit. For the reasons that follow, the Court finds that educational debt subject to an IBR plan is noncontingent for purposes of the § 109(e) unsecured debt limit but that § 1307(c) does not require the Court to dismiss a case if the inclusion of educational debt causes a debtor to exceed the limit.

**I.   Educational Debt Subject to an IBR Plan Is Noncontingent.**

Section 109(e) provides that "[o]nly an individual . . . that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $394,725 . . . may be a debtor under chapter 13 of this title." 11 U.S.C. § 109(e). In the present case, the trustee and Pratola disagree as to whether educational debt that is subject to an IBR plan is noncontingent.

4

Pratola argues that the educational debt is contingent because there is a possibility that a portion of the debt may be partially forgiven under the IBR plan in the future. According to Pratola, the debt is contingent because the parties entered into loan agreements with the knowledge that some of the debt may ultimately be forgiven. In response, the trustee argues that, despite the possibility of partial forgiveness, the debt itself is noncontingent because liability for the entire amount was fixed prior to and existed as of the date of filing the petition.

A debt is contingent if either its existence or amount depends on some future event that may or may not occur. *In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995). Accordingly, if the event giving rise to liability has already occurred, then the debt is noncontingent. *In re McGovern*, 122 B.R. 712, 716 (Bankr. N.D. Ind. 1989). "The distinction between contingent and noncontingent debts turns upon whether or not there is a presently existing duty, which should be fulfilled, as opposed to a duty which may arise sometime in the future." *Id.* Thus, the analysis focuses on whether the debt already exists because of events that took place in the past or whether the debt may come into existence because of events that may take place in the future.

Pratola entered into loan agreements under which he received advances to pay for the tuition and costs associated with attending college and graduate school. (Docket No. 23, at 2, ¶ 4.) After graduation, he chose to repay the loans pursuant to an IBR plan. (*Id.* at 3, ¶ 8.) Upon successful completion of such a plan, the balance remaining, if any, will be forgiven. (*Id.* at ¶ 6.) Pratola's educational debt is not uncertain or dependent on an event that may or may not happen. The debt came into existence when Pratola entered into the loan agreements. The amount of the debt was fixed by the amount of advances that he received and the interest rates that he agreed to. There is no future event that needs to occur before the debt comes into existence—it already exists.

5

Pratola was liable for the entire balance of the educational debt when he filed for bankruptcy. He will remain liable for that balance unless and until the debt is either paid in full or forgiven. There are several events that could occur that would eliminate the possible forgiveness of the debt. For example, forgiveness will not be granted if Pratola defaults under the IBR plan. Nor will any debt be forgiven if Pratola has an increase in income that allows him to repay the entire balance. It is the possibility of forgiveness that is contingent, not the debt itself. On the date of the filing of his petition, Pratola had a presently existing duty to pay back his educational debt. Therefore, the debt is noncontingent.

Having determined that educational debt subject to an IBR plan is noncontingent for purposes of the § 109(e) unsecured debt limit, the Court now turns to whether § 1307(c) requires the dismissal of a case if the inclusion of educational debt causes the debtor to exceed the limit.

## II. The Court Is Not Required to Dismiss a Case in Which the Debtor Owes Educational Debt in Excess of the Unsecured Debt Limit.

Pursuant to § 1307(c), "the court may convert a case under . . . chapter [13] to a case under chapter 7 of this title, or may dismiss a case under . . . chapter [13], whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1307(c). When ruling on a motion to dismiss, the threshold issue is whether "cause" exists. If cause does not exist, then the motion must be denied. *See In re Nelson*, 343 B.R. 671, 675 (B.A.P. 9th Cir. 2006). If cause does exist, then the court has discretion to either dismiss or convert the case, whichever is in the best interests of creditors and the estate. *Id.*

The trustee asserts that there is cause to dismiss this case because Pratola has debt that exceeds the § 109(e) unsecured debt limit, rendering him ineligible for chapter 13 relief. To

6

determine whether the trustee's assertion is cause for dismissal, the Court first looks to the statute itself. While the word "cause" is not expressly defined, § 1307(c) provides a nonexhaustive list of circumstances that constitute cause, such as unreasonable delay, failure to file a plan, and failure to make plan payments. 11 U.S.C. § 1307(c).

Despite the fact that the list does not include ineligibility under § 109(e), courts agree that ineligibility is usually cause for either dismissal or conversion if the debtor owes more than the statutory debt limit. *See In re Day*, 747 F.2d 405, 407 (7th Cir. 1984) (affirming dismissal when a debt deemed to be unsecured caused the debtor to exceed the unsecured debt limit); *In re Dobkin*, 12 B.R. 934, 936 (Bankr. N.D. Ill. 1981) (dismissing case after debtors amended their schedules post-confirmation to add unsecured debt that caused them to exceed the limit). However, ineligibility is not an absolute cause for dismissal or conversion when a debtor owes more than the § 109(e) debt limit. *See United States v. Edmonston*, 99 B.R. 995, 996 (E.D. Cal. 1989) (refusing to dismiss or convert case for ineligibility when the creditor moved to dismiss the case post-confirmation).

The Court was unable to locate any published opinions that specifically address the narrow issue here, whether the existence of educational debt in excess of § 109(e) unsecured debt limit is cause for dismissal or conversion under § 1307(c). Neither § 1307(c) nor § 109(e) expressly requires the Court to dismiss a case under such circumstances. The Court is without clear direction from the Bankruptcy Code and courts as to whether cause for dismissal under § 1307(c) exists here. To the extent that the language of the statute is ambiguous, the Court may look beyond the text and at legislative history in order to reach a decision. *See In re UAL Corp.*, 307 B.R. 80, 85 (Bankr. N.D. Ill. 2004).

7

    a.    **Congress Did Not Intend to Exclude Individuals with Large Amounts of Educational Debt from Being Debtors Under Chapter 13.**

Congress codified and enacted the chapter 13 debt limits as part of the Bankruptcy Reform Act of 1978. Pub. L. No. 95–598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101, 109(e)). The original limits were $100,000 for unsecured debts and $350,000 for secured debts. *Id.* Congress adjusted the dollar amounts in 1994 and provided for another adjustment on April 1, 1998 and at each three-year interval thereafter. Pub. L. No. 103–394, § 108, 108 Stat. 4106 (1994) (codified as amended at 11 U.S.C. §§ 104(a), 109(e)). The adjustments reflect the changes in the Consumer Price Index for All Urban Consumers, published by the Department of Labor. 11 U.S.C. § 104(a). The current limits are $394,725 for unsecured debts and $1,184,200 for secured debts. 11 U.S.C. § 109(e).

The reason Congress created the debt limits relates to another change it made to § 109(e). Before the Bankruptcy Reform Act of 1978, only "an individual whose principal income [was] derived from wages, salary, or commissions" was eligible to be a chapter 13 debtor. H.R. Doc. No. 93-137, at 118-119 (1977). Individuals whose income was derived from other sources, such as social security, pension plans, or small businesses, were ineligible. *Id.* Congress sought to expand the availability of chapter 13 bankruptcy relief to individuals with regular income derived from other sources because it considered the alternative of chapter 11 to be "too cumbersome a procedure" for those debtors. *Id.* To that end, Congress changed § 109(e) to include all "individuals with regular income." 11 U.S.C. § 109(e).

The debt limits were created in response to the expansion of chapter 13 eligibility to business owners. Congress recognized that large business owners might be tempted to file under

8

chapter 13 in order to avoid chapter 11. *Id.* Under chapter 11, creditors are afforded greater protection. They are allowed to vote on the plan, and the formation of an unsecured creditors' committee is required. In order to keep debtors with large businesses from filing chapter 13 cases, Congress created the debt limits. The Report of the Committee on the Judiciary (the "Report") relating to the bill that eventually became the Bankruptcy Reform Act of 1978 explains that the debt limits are aimed specifically at large businesses:

> The bill places dollar limitations on the amount of debts of the proprietor who may use chapter 13, *in order to prevent sole proprietors with large businesses from abusing creditors by avoiding chapter 11*. The limits create an irrebuttable presumption that *chapter 13 is inappropriate for businesses* with more than $100,000 in unsecured debt or more than $500,000 in secured debt.

*Id.* (emphasis added). The Report's focus on large businesses demonstrates that the debt limits were not created to prevent individual wage earners with large amounts of consumer debt from filing chapter 13 cases.

In particular, individuals with large amounts of educational debt are not the type of debtors whom Congress intended to exclude from chapter 13. In fact, the same reason for expanding chapter 13 eligibility in the Bankruptcy Reform Act of 1978 applies to preserving eligibility for individuals with large amounts of educational debt—those individuals should be able to file under chapter 13 because chapter 11 would be "too cumbersome a procedure."

Further, the concern about creditor protections in cases filed by individuals with large amounts of business debt does not exist in cases filed by individuals with large amounts of educational debt. While creditors holding business debt may prefer the greater protection available in chapter 11, creditors holding educational debt likely prefer chapter 13 for several reasons. First, some courts allow debtors to cure and maintain educational debt payments through their chapter

9

13 plans. *See In re Belda*, 315 B.R. 477 (N.D. Ill. 2004); *In re Johnson*, 446 B.R. 921 (Bankr. E.D. Wis. 2011). Second, educational debt is generally nondischargeable; thus, regardless of how it is treated in a chapter 13 plan, educational debt will still exist once the debtor's case is over. *See* 11 U.S.C. § 523(a)(8). Finally, chapter 13 debtors repay some if not all debts through their plans, and any remaining debts are discharged; therefore, they emerge from bankruptcy with a greater ability to repay educational debt. Congress simply could not have intended to exclude otherwise eligible individuals from being chapter 13 debtors solely because of educational debt that exceeds the limit.

### b. The Unsecured Debt Limit Fails to Account for the Changing Nature and Increasing Amount of Educational Debt.

Since the passing of the Bankruptcy Reform Act of 1978, the law has evolved to treat educational debt differently from other general unsecured debt. During the same time period, educational costs and debts in the United States have increased dramatically, while the chapter 13 debt limits have increased only gradually. The interaction of these trends creates an absurd situation in which an individual with modest income and a large amount of educational debt may exceed the chapter 13 debt limits.

Both the legislature and the courts have traditionally afforded unique treatment to educational debt. Unlike most other general unsecured debts, educational debt is presumed to be nondischargeable, absent a showing of undue hardship. 11 U.S.C. § 523(a)(8). The current law is the result of several Bankruptcy Code amendments that have gradually made it more difficult to obtain a discharge of educational debt. Upon the passing of the Bankruptcy Abuse Prevention and Credit Protection Act (BAPCPA) in 2005, both public and private educational debts effectively became nondischargeable. *Id.* In addition, courts have generally permitted chapter 13 debtors to

10

classify educational debt separately from other general unsecured debt under certain circumstances pursuant to §§ 1322(b)(1) and (b)(5). *See Belda*, 315 B.R. at 486 (allowing debtor to cure and maintain student loans as long-term debt under § 1322(b)(5) as long as such treatment did not unfairly discriminate against other unsecured creditors pursuant to § 1322(b)(1)); *Johnson*, 446 B.R. at 926 (holding that separate classification of long-term educational debt in plan was not unfair discrimination). As educational debt has become increasingly difficult to discharge and chapter 13 debtors have been permitted to classify it separately in their plans, educational costs and debts have skyrocketed.

Although the treatment of educational debt has changed and educational costs and debts have increased significantly, the chapter 13 debt limits have increased minimally by comparison. Since 1978, the unsecured debt limit has increased at a rate of 7.6% per year on average.[4] From 1978 to 2015, the cost of obtaining a post-secondary education increased at a rate of 20.7% per year on average.[5] *Digest of Educ. Statistics*, Nat'l Ctr. for Educ. Statistics, https://nces.ed.gov/programs/digest.[6] And in just the last ten years, the total amount of public educational debt has increased at a rate of 16.5% per year on average.[7] *Portfolio Summary*, Fed. Student Aid,

---

[4] This figure is calculated as follows: Debt limit in 2017 (394,725) divided by debt limit in 1978 (100,000), minus one, multiplied by 100, divided by number of years (39).

[5] This figure is calculated as follows: Total costs in 2015-16 (22,432), divided by the costs in 1978-79 (2,587), minus one, multiplied by 100, divided by number of years (37).

[6] Follow the hyperlink, "Most Current Digest Tables"; then select "Table 330.10."

[7] This figure is calculated as follows: Total dollars outstanding in 2017 (1,366,900,000,000) divided by total dollars outstanding in 2007 (516,000,000,000), minus one, multiplied by 100, divided by number of years (10).

https://studentaid.ed.gov.[8] The ever-increasing gap between educational costs and debts and the debt limit has created the problematic situation in this matter, in which an individual with modest income and an immense amount of educational debt is best suited for chapter 13 bankruptcy but exceeds the § 109(e) unsecured debt limit.

### c. The Existence of Educational Debt That Exceeds the Limit Is Not Cause for Dismissal of the Case.

Based on the foregoing examination of the relevant statutory language, case law, and legislative history, as well as the practical realities of the case, the Court holds that there is no cause for dismissal of this case. The express language of § 1307(c) does not require the Court to dismiss a case in which a debtor exceeds the § 109(e) unsecured debt limit. Nor does case law suggest that the Court must dismiss absolutely every case in which a debtor exceeds the limit.

Here, Pratola exceeds the unsecured debt limit solely as a result of his educational debt. Dismissing his case would not advance the Congressional intent behind the debt limits, and doing so would hinder the principal purpose of the Bankruptcy Code—to grant a "'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007).

Further, the decision to not dismiss the case also advances the best interests of creditors and the estate. Through his chapter 13 plan, Pratola will be able to remain current on his educational debt and contribute future earnings to the estate to pay other general unsecured creditors a percentage of their claims. The alternatives of dismissal and conversion are not favorable to any party in interest. If the case were dismissed, Pratola might be able to continue

---

[8] Follow the hyperlinks (in order): "Data Center"; "Student aid data"; "Federal Student Aid Portfolio"; "Federal Student Aid Portfolio Summary."

12

making payments on his educational debt, but it is impossible to predict whether he would be able to make any payments to other general unsecured creditors. If the case were converted to a case under chapter 7, the educational creditors would remain unaffected because their debt is effectively non-dischargeable, but the other general unsecured creditors would likely receive no dividend. Finally, if the case were converted to a case under chapter 11, Pratola would incur substantial fees and costs navigating the "too cumbersome a procedure" that is simply not suited for a reality such as his.

In sum, the Court finds that the existence of educational debt in excess of the § 109(e) limit is not cause for dismissal or conversion of this case under § 1307(c). Permitting the case to proceed under chapter 13 is in the best interests the creditors and the estate, as well as Pratola.

## CONCLUSION

For the foregoing reasons, the Court will deny the trustee's motion to dismiss. A separate order will be entered consistent with this Memorandum Opinion.

Dated: December 27, 2017

ENTERED:

Janet S. Baer
Bankruptcy Judge